# EXHIBIT T

```
 1              UNITED STATES DISTRICT COURT

 2          WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3   _____

 4                             )
     WSOU INVESTMENTS, LLC d/b/a )  C20-01878-BJR
 5   BRAZOS LICENSING AND         )
     DEVELOPMENT,                 )  SEATTLE, WASHINGTON
 6                               )
                    Plaintiff,   )  September 30, 2021
 7                               )
     v.                          )  9:00 a.m.
 8                               )
     F5 NETWORKS, INC.,          )  Telephonic Motion
 9                               )  Hearing
                    Defendant.   )
10                               )
     _____

11

12           VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE BARBARA J. ROTHSTEIN
13            UNITED STATES DISTRICT JUDGE
     _____

14

15   APPEARANCES:

16

17    For the Plaintiff:      Hershy Stern
                              Kasowitz Benson Torres
18                            1633 Broadway 21st Floor
                              New York, NY  10019
19

20    For the Defendant:      David Shane Brun
                              King & Spalding
21                            601 S. California Avenue
                              Suite 100
22                            Palo Alto, CA  94303

23                            Brent P. Ray
                              King & Spalding
24                            110 N. Wacker Drive
                              Suite 3800
25                            Chicago, IL  60606
```

```
 1                          Ramsey M. Al-Salam
                            Perkins Coie
 2                          1201 3rd Avenue
                            Suite 4900
 3                          Seattle, WA  98101

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  United States District Court for the

2    Western District of Washington is now in session.  The

3    Honorable Barbara J. Rothstein presiding.

4       This is the matter of WSOU Investments versus F5 Networks,

5    Cause No. 21-123, assigned to this court.

6       Would counsel please make their appearances for the

7    record?

8          MR. STERN:  Good morning, Your Honor.  This is Hershy

9    Stern from Kasowitz Benson Torres, for plaintiff WSOU

10   Investments.  Thank you.

11         THE COURT:  Good morning.

12         MR. AL-SALAM:  Good morning, Your Honor.  This is

13   Ramsey Al-Salam from Perkins Coie for defendant F5 Networks.

14   And I'm accompanied by Shane Brun and Brent Ray from Keen &

15   Spalding, who I will let make separate appearances.

16         THE COURT:  Can you spell your name, Mr. Al-Salam?

17         MR. AL-SALAM:  A-L-S-A-L-A, M as in Mary.

18         THE COURT:  Got it.

19         MR. BRUN:  Hello, Your Honor.  This is Shane Brun

20   with King & Spalding, on behalf of F5.

21         THE COURT:  Okay.

22         MR. RAY:  Good morning, Your Honor.  This is Brent

23   Ray, also of King & Spalding, for F5.

24         THE COURT:  Okay.  Okay.

25      And let me start with you, Mr. Stern.  I'm sure counsel

1   have spoken.  So what is left that you still haven't gotten

2   that you want, Mr. Stern?

3           MR. STERN:  Sure.  Thank you very much, Your Honor.

4   Simply put, almost everything.  We have --

5           THE COURT:  Well --

6           MR. STERN:  Unfortunately.

7       WSOU has propounded document requests and interrogatories

8   back in April.  Since then, defendant F5 have interposed

9   their objections and responses.  And we've met and conferred

10  no less than three times, with a bunch of letters and e-mails

11  going back and forth.  To date, which is now five months

12  since then, defendant F5 has produced 150, quote-unquote,

13  technical documents, most of which make up publicly available

14  user manuals and white pages off of the F5 website.  That's

15  with respect to technical documents.

16      In addition, we were -- we've been informed that we will

17  receive, at some point, source code for certain accused

18  products.  However, we were also recently informed that

19  notwithstanding that it's been five months, that there is

20  going to be an issue with the production of source code for

21  one of the products, because it's located in Israel, and

22  there's some export control laws that may apply.  So we've

23  been given no information when those issues will be resolved

24  and when we'll receive that source code.

25      With respect to the financial documents that F5 has

1   represented that they will produce, we've received one

2   document.  That document has merely revenue information, by

3   year, for only a portion of the damages, period, from about

4   2014 through about 2021, I believe.  But the patents expire

5   years from now.  So we have received no information about

6   projections.

7       Indeed, with respect to that financial document, we don't

8   even have the number of units that are sold, the number of

9   users, gross profits as opposed to net, operating costs,

10  things like that.  All that type of information, we

11  understand, to be basic -- part of the basic technical and

12  financial productions that we were supposed to receive.

13      On top of it, there's an overarching -- there is an

14  overarching dispute with respect to the definition of accused

15  products, and what F5 believes should be -- that should be

16  limited to.  There are two categories under that realm.  One

17  would be those products that WSOU has specifically identified

18  as infringing, as part of -- or in its

19  preliminary-infringement contentions.

20      And then the second subcategory would be within the

21  definition of accused products in the discovery requests that

22  WSOU has propounded.  In other words, in our discovery

23  requests, and in the preliminary contentions, we said, you

24  know, we're seeking discovery over F5's accused device

25  products or instrumentalities, that, for example, would have

1    the functionality of active load balancing.  Because we

2    believe that's the subject of one of the five patents at

3    issue.

4        F5 has taken the position that they are not -- that we're

5    not entitled to such discovery over those types of products,

6    because we didn't identify it.  We believe we've identified,

7    sufficiently enough, and the case law that we cited for F5

8    shows that courts around the U.S. have found that plaintiffs

9    in patent cases are entitled to discovery over accused

10   products, that are not necessarily identified in the

11   contentions themselves.

12       Now, with respect to those that were identified in the

13   contentions, there's a dispute about which ones were actually

14   identified and what WSOU is entitled to.  For example, WSOU

15   has identified the BIG-IP system, and a VIPRION system.  F5

16   has informed us to say, well, that's just the hardware you've

17   identified, and that hardware doesn't have any of the

18   functionality, it's really the software that customers use

19   within that hardware.  But that distinction shouldn't be with

20   a difference, because in our contentions you can't run those

21   software modules without the BIG-IP and VIPRION systems.  So

22   we're entitled to the software.

23       It's difficult, or it's without our control, to have -- to

24   be able to identify every piece of software by name.

25   Notwithstanding, F5 doesn't even want to tell us the name of

1   the software, of the pieces of software within the products,

2   which is the subject of an interrogatory request.

3        Beyond that, there are almost, I believe, seven categories

4   of documents that are the subject of this motion to compel.

5   Those are the technical documents we discussed, the financial

6   documents, including projections, as well as the business and

7   marketing plans.  Those all go to damages.  As well as

8   consumer and industry demand and awards.  That goes to

9   reasonable royalty.  Reasonable royalty factors, as well as

10  licensing policies.  And the actual licensing royalty and

11  other settlement agreements that would have rates, the rates

12  and the payments with respect to any of the accused products

13  for which F5 has entered into, with either other entities

14  that have patents accused of infringements, or any other

15  deals, or any other --

16           THE COURT:  Let me interrupt you for a minute.  I

17  assume that these financial documents go to damages; is that

18  correct?

19           MR. STERN:  Yes, Your Honor.

20           THE COURT:  All right.  Just checking.

21           MR. STERN:  Of course.  Thank you, Your Honor.

22       Beyond that, there's competing products as well, which

23  also goes to the reasonable royalty, as well as

24  non-infringing alternatives.  And, then, just basic documents

25  like organizational charts and information about their

 1  organizational structure.  We're entitled to that information

 2  to understand, you know, who has the information relating to

 3  these products, and whether we're going to need to depose

 4  them in this case.  But we haven't gotten anything beyond

 5  those 154 documents at this point.  So now we're at --

 6          THE COURT:  Go ahead.

 7          MR. STERN:  We're at now September 30th, and fact

 8  discovery closes January 6th in this case.  Thank you, Your

 9  Honor.

10          THE COURT:  Okay.  Mr. Al-Salam, are you the one

11  that's going to speak?

12          MR. AL-SALAM:  No, I'm going to have Shane Brun

13  address the issues.

14      Mr. Ray is on the call, just so you know, to address the

15  claim-construction dispute, if the court is going to hear

16  that dispute.  And Mr. Ray has another hearing in less than

17  an hour and a half.

18          THE COURT:  Well, I can assure you -- I'll let

19  Mr. Ray go -- I have no intention of hearing a

20  claim-construction dispute on a phone call.  I think that is

21  not the way I usually handle it.  So, Mr. Ray, you can go to

22  your next hearing.  Okay?

23          MR. RAY:  Thank you, Your Honor.

24          MR. AL-SALAM:  So, Mr. Brun will handle the discovery

25  hearing.  Thank you, Your Honor.

1      THE COURT:  Okay.  Mr. Brun, take it away.

2      MR. BRUN:  Thank you, Your Honor.  Shane Brun, King &

3  Spalding, on behalf of F5.

4    And so I'll start from the beginning where Mr. Stern did.

5  And, actually, if you don't mind, Your Honor, since we do

6  have a court reporter making a transcript, keeping a record

7  for us, can I just quickly state for the record, just to

8  address when the requests were served, and Mr. Stern's

9  reference to and counsel's reference to the five-month

10  period?  We don't have to go into it now, I'd just like to

11  put it on the record so we have it.  Is that okay?

12      THE COURT:  Sure.

13      MR. BRUN:  Okay.  Perfect.

14    So, counsel stated that the original request,

15  interrogatories and requests for documents were served on

16  April 9th.  So I'll accept that as the case.  At the time

17  there was a different team of lawyers from Mr. Stern's firm

18  handling the case.  Through a set of mutual and reciprocal

19  extensions, F5 served its responses to the request for

20  production and interrogatories on June 1st of 2021; and so

21  just about four months ago.

22    After we served those responses where we raised all the

23  objections -- several of which we've identified with respect

24  to what we sent to the court so far -- after we served those

25  responses on June 1st, WSOU waited over five weeks, until

 1  July 9th, before claiming any deficiencies in F5's responses.

 2  F5 responded to WSOU's July 9th letter, just two business

 3  days later, on July 13th, offering to meet and confer with

 4  respect to WSOU's complaints about our responses.

 5      Then it was more than two weeks, again, until July 30th,

 6  until WSOU responded to schedule a meet and confer.  And then

 7  the first meet and confer between the parties occurred on

 8  August 6th.  And then since then, Your Honor, our meet and

 9  confer -- and I put that in air quotes, because I don't think

10  it was a Rule 37 meet and confer -- over a period of three

11  weeks until August 27th where Mr. -- where counsel felt like

12  we were at an impasse, and we arranged the first court call

13  starting on September 1st.

14      So thank you very much for letting me just put that in.

15  But it basically shows, over the last four months, that two

16  months of the delay were not on F5, but specifically due to

17  WSOU's time in responding to us and raising their issues with

18  our response.

19          THE COURT:  Okay.  Now that you've cleared that up,

20  how about addressing Mr. Stern's concerns about why you

21  haven't turned over some of the documents?

22          MR. BRUN:  Yes, absolutely.  And thank you so much

23  for letting me put that into the record.  And, so, this is a

24  patent case.  And this court, and several other courts who

25  hear a lot of patent cases, have specific rules that set the

1     mete and bounds of the case.

2         So in this case, WSOU identified or served their

3     infringement contentions, identifying their accused products.

4     In response to that, F5 served their non-infringement

5     contentions, in response to the infringement contentions.

6         And then, since then, with respect to the requests that

7     we've received, we have not -- or we have agreed -- and this,

8     again, was in the latest submission in response to the

9     court's request -- notwithstanding the breadth of the

10    request, we've agreed for the accused products, and I've

11    started producing for the accused products, documents that

12    show the operation of the accused features and functionality

13    in the accused products identified in the infringement

14    contentions.  And we've also agreed to produce the financial

15    information, that often are the standard productions in a

16    patent case.  Sales, revenue, cost of goods sold, and

17    profits.

18        And on one of the issues that counsel just raised -- and

19    it's helpful to understand the structure of F5's products.

20    There is hardware, the BIG-IP and VIPRION system; it's

21    basically an empty box.  And on that box F5 loads its

22    functioning products, which are software modules that do

23    various functions for big corporations.  F5's products are

24    part of a computer-networking infrastructure that sit in

25    between, of course, our offices, and the outside world.

1      And so for each stage BIG-IP or VIPRION hardware, there

2   are 10, 15, perhaps 20 different modules, software modules

3   that are on that box.  When those boxes are sold with those

4   modules, F5's customers are only interested, usually, in

5   either one or two, or at most, maybe a handful of those

6   modules.  And so they get a license key.  That's the purchase

7   of the module.  They can open that.  But they can't use the

8   other modules on the hardware.  And so one of the things that

9   I have informed counsel about is F5 tracks and has

10  information relating to sales and revenue for each of the

11  accused modules, and for the BIG-IP and the VIPRION.

12      What F5 does not track and doesn't keep track of, are

13  specific costs, the costs of developing those particular

14  modules, does not keep that information as part of its normal

15  course of its business.  But because those are generally

16  required and standard productions in patent cases, we have

17  met with and interviewed F5's internal financial people, and

18  they are -- it's a big list -- but they are in the process of

19  going back and looking at the information that they have, and

20  are doing their absolute best to develop the cost of

21  developing each of the individual modules that have been

22  accused.

23      That process is getting close to complete.  And I would

24  expect to have that information, and then we can explain how

25  the information was calculated, and how it was reached,

1   within the next couple of weeks.  And then counsel then can

2   depose, or send additional interrogatories, to the extent

3   they have questions about that.  But that is information that

4   has to be generated.  And so that is in process, and we've

5   agreed to do that.

6        THE COURT:  And when you furnish that information, it

7   will come with names of people so they can know who to

8   depose?

9        MR. BRUN:  Yes.  We have agreed -- and thank you for

10  that question.  There was -- we have agreed, in response to

11  an interrogatory that asks for a lot more of -- well, beyond

12  what's required by Rule 26, 34.  But we have agreed, for each

13  of the accused products, and the financial information, to

14  provide WSOU a list of three people, identify three people

15  who are knowledgeable about the accused products, and who are

16  knowledgeable about the financial information, we'll include

17  the cost of goods sold and how that was calculated.  And we

18  have started to provide that information.

19      We've sent an initial e-mail, because we want to get that

20  to counsel as fast as possible, identifying persons

21  knowledgeable about each of the accused products.  For most

22  of those, I believe we've given the three that we've agreed

23  to.  For a couple of them, we've given one or two names, but

24  we're in the process of finding more.

25      For the financial people, we have interviews set up next

1   week, with various people from our finance department, and

2   will be providing the names of three people in the financial

3   group that are knowledgeable with respect to, again, the

4   sales and the costs of goods sold for the accused products.

5           THE COURT:  Okay.  Let me ask you another question.

6       When you talk about modules, I assume that has to do with

7   software, right?

8           MR. BRUN:  Correct.

9           THE COURT:  So you're not making the distinction that

10  Mr. Stern was worried about, that you would only be turning

11  over those empty boxes and not the software, right?

12          MR. BRUN:  Not at all.  And on top of that, Your

13  Honor, if I can add -- so, what's relevant, what's at issue

14  in the case, are particular pieces of functionality in each

15  of the modules.  So, for example, one of the modules that's

16  accused, in a couple of the cases that have been filed, is

17  the Policy Enforcement Manager, the PEM module.  For that

18  module, in WSOU's infringement contentions, there's specific

19  functionality that's accused, as supposedly meeting each of

20  the limitations.

21      So, often, and under the rules, a defendant could just

22  identify documents for those, for that particular

23  functionality, and source code for that particular

24  functionality.  We are not parsing it that way.

25      F5 is going to produce the entire code for the Policy

1   Enforcement Manager.  Same for the LTM, which is Local

2   Traffic Manager product that's been accused.  And the two

3   other modules that's been accused.

4       And we are also producing, Your Honor, if I heard counsel

5   correctly, to say that we haven't agreed to produce documents

6   with respect to hardware, the BIG-IP and the VIPRION.  If you

7   look at their infringement contentions, WSOU's infringement

8   contentions, none of the hardware features are identified as

9   meeting any of the limitations of the patents.  We've asked

10  counsel to identify any limitations that they've been alleged

11  to meet.  They haven't identified those.  But nonetheless,

12  because they have been identified as accused products in the

13  various definitions, we have agreed to produce schematics,

14  other internal documents that show all the features of the

15  hardware products as well.  So things that haven't even been

16  identified as meeting the limitations, we are providing that,

17  as well full source code and schematics for the hardware.

18          THE COURT:  Okay.  And you expect to be able to

19  provide all this information that you have just gone over, by

20  when?

21          MR. BRUN:  And so with respect to the technical

22  documents, as Mr. Stern or as counsel mentioned, F5 has

23  produced 150, or so, technical documents.  Several of those

24  -- and a lot of those -- it may, in fact, be most that we've

25  produced -- are user manuals, other types of manuals, user

1  guides, that are available through F5's website.  A lot of

2  those you have to log into to get.

3          THE COURT:  He is obviously talking about something

4  different than that.

5          MR. BRUN:  Correct.  Correct.  And I was getting to

6  it, I was just taking too long.  For dozens in that

7  particular production, dozens of the documents are internal,

8  highly confidential, attorneys' eyes only, technical

9  documents that are not publicly available.  We produced

10  dozens of those across each of the modules.

11     But because this is a software case, as you mentioned, the

12  source code is really where the proof is in the source-code

13  pudding.  And that information, the source code, we are going

14  to be receiving three of the four accused modules within the

15  next few days.  As soon as we get that, we will put that on

16  -- we'll go through the procedures, and we will have that

17  ready for review, if not by the end of next week, certainly

18  the week following that; so, the second week in October at

19  the latest.

20          THE COURT:  Okay.  Well, it sounds like -- I'm just

21  curious, Mr. Brun, have you told this to the plaintiffs?

22          MR. BRUN:  Oh, yes.  Yes.  Many times.  Many times.

23          THE COURT:  Mr. Stern, why are we here, if you can

24  get all this?

25          MR. STERN:  Sorry to interrupt, Your Honor.

1    THE COURT:  No.  That's the question.  Why do you

2    need me?

3    MR. STERN:  Sure.  So, on the technical-documents

4    side, counsel has explained, or agreed that almost all of the

5    production we've received, out of the 150 documents, are just

6    user manuals.  What we're looking for is internal

7    documentation regarding how the source code was created, how

8    it works, the architecture of the source code, how it

9    interacts with the hardware.

10    THE COURT:  Well, I realize --

11    MR. STERN:  I'm sorry, Your Honor.

12    THE COURT:  I realize what he's given you, the

13    150 pages from the website is not what you're looking for.

14    But I heard him say that he's going to be providing you with

15    information on the software, and the functionality.  And he's

16    going to be providing you with the names of three people that

17    you can talk to and get this information from.  Why isn't

18    that what you're asking for?

19    MR. STERN:  Because we've received -- that is what

20    we're asking for.  What we've received hasn't been sufficient

21    of the internal documentation, before you get the source

22    code.  In other words, our understanding is that when you get

23    the source code, you're getting lines of the actual

24    underlying code.

25    There are, usually in these large companies, documents

1   centrally located, you know, so it's not difficult to find,

2   that actually explain the architecture of the source code and

3   how it works.  So we'd like those types of documents.

4       What we've received, aside from the user manuals, are a

5   limited number of presentations.

6           THE COURT:  I'm not concerned about what you've

7   received.  Okay?  I know that what you've received is

8   inadequate.  And I think Mr. Brun agreed that it was

9   inadequate, and is now planning to supplement it.

10      So let me switch back to you, Mr. Brun.  This

11  architectural information that they're looking for, is that

12  part of what you're going to be turning over in a couple of

13  weeks?

14          MR. BRUN:  And so on that point, I believe that some

15  of the architectural-type documents, if they haven't been

16  produced already, I agree with counsel, that some of those

17  may be relevant.  The issue with their request is, they're so

18  over-bogged through asking for all documents, and based on

19  their definitions of the accused products, related products,

20  they're really asking for documents relating to every single

21  product or module F5 has.  And while we can try to parse

22  their request, and guess at what they're asking for, we have

23  asked them several times, on this particular -- on this

24  request, on the financial-document request, on the

25  marketing-type request, to sit down and talk with us, and

1   tell us what it is they're looking for, narrow their request.

2   And they simply have refused to do that.  And I could read

3   you, if it's okay, I can read you the types of requests we've

4   been making, to which they've refused to even talk with us.

5          THE COURT:  No, I don't need you to read it to me,

6   because I can see from the requests, Mr. Stern, it's clearly

7   overbroad.  You can't say "other specified products."  I

8   mean, "related products."  They have to be specific.  And

9   right now I think they would be limited to what you have set

10  forth as offending products that you have specified.  I have

11  a hard time, Mr. Stern, understanding what -- please don't

12  tell me, again, what you've received.  I think we all agree

13  that what they've given you thus far is inadequate.  But I

14  think they may need some more specificity as to what you want

15  them to turn over.  Though they seem to have enough

16  specificity to be turning over quite a bit of material in a

17  couple of weeks.

18      So why don't we do this, counsel:  Why don't I set a date,

19  in a couple of weeks, by which defendant will turn over what

20  it considers responsive to plaintiff's request, all the

21  things, the names of the people.  I'm not going to be

22  specific about it.  But I guess the modules, the software,

23  all of that.  And, I don't know -- what would be a good date?

24  I'm looking for a calendar date here.  October --

25  October 15th.  Can you do it by then?  Or the 22nd?

1       MR. STERN:  October 15th is fine, Your Honor, with

2   plaintiff WSOU.

3       Your Honor, if I could address some of those points that

4   Your Honor made, to clarify for the record, I'd greatly

5   appreciate it.

6       THE COURT:  Well, I was going to suggest, Mr. Stern,

7   before you go through the clarifications, to see if this

8   would be a help to you, that you get what they're turning

9   over, and then after you've had a chance to go through it --

10  and maybe take depositions, that's up to you -- you then see

11  specifically what you haven't gotten that you need.

12      Wouldn't that be a better way to go, than you're trying to

13  list them all now, because you don't know what you're

14  getting.  You don't know if you're getting some of the things

15  you're concerned about, right?

16      MR. STERN:  Correct, Your Honor, with a minor

17  modification, if I may.

18      So I think what Mr. Brun is saying is that anything that

19  has been identified in the primary infringement contentions,

20  defendant F5 will produce the technical documents, financial

21  documents, and so on, in what they believe is responsive to

22  the request.  Two points that I'd like to make.  With respect

23  to the specificity of accused devices that have not been

24  specifically identified in the preliminary infringement

25  contentions.  We've provided counsel for defendant F5 with a

1    list, five categories that represent the technology in the

2    five patents.  And we've asked counsel, we've said:  To the

3    extent F5 has a device that has that functionality, we're

4    entitled to the discovery.

5         Those five categories are:  Calculating activity factor;

6    generating billing information; resource management; active

7    load balancing; and delivery of targeted information.  Those

8    fall within the technology that's being accused, that F5 may

9    have products that they offer, separate and apart from those

10   that are actually identified within the --

11        THE COURT:  Let me ask you something, Mr. Stern.  And

12   bearing in mind that I am not really very familiar with your

13   case yet, and the various modules that you're talking about,

14   but wouldn't it make more sense to determine whether there

15   are infringements on the ones you specified?  And once we

16   know that there are infringements, if indeed there are, then

17   you can go ahead and look at all the other possible products

18   that contain similar software, or modules.  And we can do

19   that later on, rather than doing it all at once.

20        I mean, what you're asking for, I assume the answer is

21   going to be, is quite far flung.  And it seems a little

22   cart-before-the-horse to care about how many other products

23   actually contain what you're alleging they're infringing,

24   until we know whether it's infringing or not.  It seems to me

25   that we should make that determination, with the ones that

1   you have alleged in your complaint, or in your contentions,

2   and with the understanding that if you prevail on these, and

3   these are infringing, you'll get all that information later

4   on.  What about proceeding in that manner?

5         MR. STERN:  Understood, Your Honor.  It was just the

6   instance that we're running up against the close of fact

7   discovery.  But if that's what Your Honor wishes, that that's

8   acceptable to proceed.

9         THE COURT:  Well, maybe it's a form of bifurcation,

10  then, that would go to damages.  Obviously if you prevail and

11  it's found infringing, you would then be entitled to find out

12  how many other of their products are actually infringing,

13  once you know that there are infringing modules and content

14  involved.  And we could then reopen fact discovery.  I don't

15  know.  Mr. Brun, you're being very quiet.  But, I would

16  assume defendant would have no objection to proceeding this

17  way, am I right?

18        MR. BRUN:  Correct, Your Honor.  And I was only being

19  quiet because I didn't want to interrupt counsel or the

20  court.  I was listening very carefully.  It's early, but I am

21  staying awake.

22     And so with respect to the latter discussion, obviously we

23  would have responses to the definitions of accused products

24  and what counsel has asked for so far.  But we don't need to

25  address that now, given your suggested approach.  Agree

 1   100 percent.

 2        THE COURT:  Well, I thought you would.  I thought you

 3   would.  But I want to hear from Mr. Stern.

 4      Mr. Stern, would that enable you to proceed more

 5   expeditiously than, you know, maybe waiting a long time for

 6   them to put together all the others, and have a fight about

 7   whether it's overbroad or not?

 8        MR. STERN:  Understood, Your Honor.  That is

 9   acceptable.  I'd like to discuss it with the client.  But,

10   yes, to me, we can say that right now.  I would like just to

11   discuss it with the client.  But, yes, we understand the way

12   the court would like to proceed on this.

13        THE COURT:  Well, I think it's beneficial to you,

14   too.  Because you will then have, by October 15th,

15   presumably -- presumably -- what you need to work with.  And

16   if you don't have it all, I trust that you will let Mr. Brun

17   know and you'll try to work it out.  But at least it resolves

18   the overbroad objection and gets you going.  Okay?

19        MR. STERN:  That makes sense, Your Honor.  Thank you.

20      If I may address another issue that the court or counsel

21   for defendant F5 raised.  Counsel for F5 has said that WSOU's

22   discovery requests are overbroad, because they seek "all

23   documents concerning."  As the court may be aware, and I

24   think all parties here have done is, you know, serve

25   discovery requests with the beginning words of "all documents

1    concerning."  Now we understand that it's going to be very

2    difficult to get "all documents concerning."  However,

3    usually parties proceed by interposing objections, and then

4    conducting a search by identifying custodians that are likely

5    to have those documents, and then applying search terms,

6    relevant search terms to the custodial documents, as well as

7    centrally located file folders that would have or likely to

8    have such information.  We believe that's the appropriate way

9    for defendant F5 to go about producing documents in the

10   matter.  And that, we believe, will remedy the issue of "all

11   documents concerning."

12              THE COURT:  Mr. Brun?

13              MR. BRUN:  Yes.  Thank you.

14              THE COURT:  How were you going to produce this?  Were

15   you going to use search terms?  You mentioned three people

16   who would be able to answer questions.  And I assume we're

17   covering both financial information and substantive

18   information.

19       Am I correct?  Or, what?

20              MR. BRUN:  Correct.  And in these cases -- again,

21   it's correct, both technical and financial information.  In

22   these cases it's not hard to identify the source code and

23   produce that.  That's what's going to determine what the

24   products actually do.  I have not heard or seen anything

25   requesting the use of search terms and things of that nature.

 1    I don't recall ever doing that in a patent case.  The

 2    technical documents are relevant.

 3              THE COURT:  Let me make a suggestion here, before you

 4    get into the question of whether search terms would be

 5    necessary, and whether -- I think at this point, Mr. Stern,

 6    search terms are usually necessary, and we're talking about

 7    voluminous documents, you know.  So you're going through a

 8    company's records and it's hugely -- a huge amount of

 9    documentation.  So you do need search terms to cull them out.

10    Why don't you wait and see what you're going to get and see

11    if you need to go into search terms, you know?  And maybe

12    even take a couple of depositions and see if, indeed, you're

13    dealing with documents that would require you to get search

14    terms.  Okay?

15        What do you think about that?  It's October 15th.  It's

16    only two weeks away.

17              MR. STERN:  Understood, Your Honor.  We were just

18    trying to come up with a reasonable way to remedy any issue

19    counsel for the defendant has raised, with respect to the

20    "all."

21        In other words, we understand that in certain instances

22    there are identifiable folks that have the financial

23    information, that can access it in essentially a located

24    storage area, and they could just produce those spreadsheets.

25    Then there are other individuals in the sales and marketing

1   department that have the business plans and advertising

2   information for the accused products.  We were just trying to

3   suggest a way, that we understand has been used in prior

4   cases, and we have experience with, that kind of meets that

5   equilibrium.

6       But to the extent the court wishes that we should just

7   wait until October 15th, and then should there be any issues,

8   we'll raise it at that point, that is acceptable to plaintiff

9   WSOU.

10      Thank you, Your Honor.

11          THE COURT:  All right.  I may be speaking for

12  Mr. Brun, but I sort of interpreted his overbroad objection

13  was going to the other products that might contain these that

14  were not specifically named.

15      I didn't hear him going to the "all."  I had the feeling

16  that with the limitation we've already imposed, he was

17  comfortable, even though the word "all" was in there.

18      What about that, Mr. Brun?  Are we going to have problems?

19  I mean, do we need to deal with it at this point, or what?

20          MR. BRUN:  We do not.

21      And so the one thing that I haven't had a chance to

22  address yet, because we got onto the accused-product

23  discussion, that we're going to defer until there have been

24  some depositions on the actually identified products, the

25  October 15th date and what we should do then.

1        So one of the things that -- one of the defects in what
2    we've done so far, as far as between the parties to try to
3    meet and confer, is there has been no reasonable meet and
4    confer and attempts to narrow.

5        It doesn't surprise me that on this call today counsel has
6    given some examples and been more specific about what it is
7    that they're looking for with respect to the technical
8    documents.  The range of technical documents -- and, again,
9    it's the definitions that they imposed within these requests
10    that make them just so unwieldy, and we've asked several
11    times to just sit down with us and tell us what they're
12    looking for, some specific documents, and then we would go
13    search for that, if we all -- once we all agree what the
14    scope is.

15        To have F5 and their engineers do this piecemeal, is
16    asking too much from F5, before counsel even sit down with us
17    and try to narrow these requests.

18        So what I would suggest, before October 15th, is, one, we
19    will be producing all the names.  We will have made the
20    source code available by then.  We will have produced,
21    hopefully, costs-of-goods-sold information.  I will keep
22    counsel informed as to that process.  That is something
23    that's taking dozens of people hours.

24        But in addition to that, and parallel, for the request
25    that counsel believes that they haven't received sufficient

1    documents, it would be helpful, Your Honor, if you would

2    instruct the parties to actually meet and confer, narrow the

3    request to specific types of documents that we can discuss,

4    identify, and that I can go to our client, who then can go to

5    their engineers, who are very, very busy, and ask one time,

6    do it right the first time, so we don't have to go back and

7    revisit it again.

8        And so then we could show up on the 15th, and not only we

9    can tell you what we've produced, we can tell you what we're

10   going to produce, and what we've agreed to with respect to

11   technical documents, and with respect to financial documents.

12   Those technical documents would include, for example, as

13   counsel has mentioned, you know, specific types of software

14   architecture documents that do certain things.

15       The way the requests are written now, it just says

16   "general architecture documents, reference material,

17   high-level requirement design documents, test plans," things

18   like that, that don't give any guidance as to what F5 should

19   be looking for, what they should be producing.  And if we

20   make the decision on our own what's responsive and produce

21   it, there's no question that we'll be here again, because

22   there will be more pushing by WSOU for additional documents.

23   And we've experienced that already with respect to an

24   interrogatory response.

25           THE COURT:  I hear you, Mr. Brun.  But the

1   distinction you are making between what you heard on this

2   phone call and the way in which the request is worded,

3   doesn't sound terribly different.  What is it that you think

4   has become clearer?  They asked for architectural documents

5   on the software.

6       MR. BRUN:  I want to say what we heard on the call

7   has not made it clearer, but it is still more than what we've

8   done so far.  There has not been any effort to narrow these

9   requests, at all.  There needs to be some actual meet and

10  confer, that your standing order requires, that Rule 37

11  requires, to try to identify specific-type documents, and

12  that provide the information that they're looking for.  I

13  mean, that's the key point.

14      THE COURT:  Okay.  Mr. Stern, let me ask you

15  something:  Do you think that you all -- I don't mean you

16  alone, but you and your team -- would be able to sit down and

17  set forth, at least a preliminary first go-around, after you

18  get these -- it may open new doors that you need -- but at

19  least a preliminary set of documents that you want?  I mean,

20  you were pretty specific to me about the software, the

21  architectural software.

22      Analogous to that, do you think you could do that?

23      MR. STERN:  Sure, Your Honor.  In fact, we've created

24  a list, in response to counsel for F5's e-mail to Your

25  Honor's law clerk, laying out the categories.  There are

1   about seven categories where we've listed the specific types

2   of documents that we're looking for in those categories.

3   We've actually had meet and confers, you know.  I disagree

4   with counsel for F5's rendition of what has happened during

5   the meet and confers.  I don't want to bore Your Honor with

6   that.  But we've gone through all this.  We've asked for

7   these types of information.  We've suggested that counsel for

8   defendant F5, you know, go to the relevant custodians and

9   essentially locate files, to remedy any issue about the word

10  "all."

11      We've made these suggestions.  But I think they're written

12  out, and I think it's plain English the way I'm describing,

13  because, quite frankly, those are the notes I'm using to

14  speak with Your Honor during this call.  So that's what we've

15  listed.  Mr. Brun, I believe, has received that e-mail from

16  yesterday evening that has those categories.  I think that

17  should remedy the issue.

18      With respect to specific technical documents or getting

19  any more granular than that -- I think we've gotten

20  granular -- but, you know, F5 is the one that has these

21  documents in their possession, custody and control.  I don't

22  know what they have, from a technical-documents standpoint.

23          THE COURT:  I don't think he's concerned with -- I

24  think technical documents may be something that all of you

25  understand.  It sounds to me like you should.  But I think in

1  categories beyond that, if there's anything.

2      Look, why don't you try the list.  I, frankly, have not

3  looked at that list.  It came in last night, probably --

4  remember, I'm three hours behind you, so I didn't even look

5  at it.  But why don't you -- I'm sure now defendant has it,

6  and they probably didn't have time to look at it either.  But

7  this is a little -- something that should be done.  I can't

8  -- you know, counsel, at least on this phone call with me,

9  sound knowledgeable and cooperative, and reasonable about how

10  to get this case going.  So I am going to make a suggestion

11  that, Mr. Brun, you work with the list that he's providing.

12  If it's not clear enough, talk to each other.

13      It sounds to me like, you know, you're counsel who have

14  dealt with patent cases enough so that you understand what

15  you're talking about, and if you say:  I don't know what you

16  mean by this, then Mr. Stern can say:  This is what we mean,

17  and you can get this done.

18      I think the more you get done by October 15th, the better

19  off it should be.  So why don't you both look at that list,

20  see how far it takes you.  If you really are still in

21  trouble, you can call me back.  I'm not encouraging that, by

22  any means.  Don't think for a minute I'm inviting you back.

23  But I'd like you to get a list, to understand where you're

24  going.  And if it turns out that you can't get it, all of it

25  done by October 15th, once you go through the list, set a new

1    date by which you will get it done, you know.  The end of

2    October for some of it, and October 15th for some of it.

3         I think it's important to get enough done by October 15th

4    so that you can start taking depositions.  Because that's

5    where you're going to learn a lot more, I'm sure, Mr. Stern.

6         Is that a path that you can proceed with?

7              MR. STERN:  Yes, Your Honor.  That is definitely a

8    path we can -- WSOU can proceed with.

9         One minor point I'd like to mention is on the

10   interrogatories.  We've propounded an interrogatory to

11   defendant F5 that for each accused product -- and let's say

12   for these purposes, moving forward with Your Honor's

13   guidance -- for those accused devices that have actually been

14   listed in the primary infringement contentions, we've asked

15   for defendant to identify, by serial number, and part number,

16   or whatever names that they have for these products, whether

17   they've changed the series on them, or not, to identify what

18   the names, the exact names and how defendant F5 refers to

19   those products, and the different variations of those

20   products over the years, because we're talking about a period

21   from 2014 through 2021.  And we think that would actually go

22   a long way in kind of remedying these issues as well, knowing

23   that we're getting the information, at least now with respect

24   to those products that were specifically identified.

25             THE COURT:  Well, as long as we're limiting it to the

1   ones that are specifically identified, Mr. Brun, I assume

2   that you have no problem doing that, right?

3           MR. BRUN:  That's probably correct.  I haven't -- I

4   don't have that interrogatory in front of me.  We can talk

5   about that in our meet and confer.  But, generally speaking,

6   version numbers are different.  Again, version numbers,

7   whether it's hardware, software, through the damages period,

8   that's generally produced.  So I agree, I am sure that's

9   something that we can work out.

10      And then just one final point on the list, Your Honor.  So

11  here is the issue with the list, and let me just read you

12  one, it's two-lines long.  And, again, the issue here is the

13  list are broad categories of documents, without a statement

14  as to what they're looking for.

15      So Item No. 3 on the list.  It says:  Business and

16  marketing plans, projection reports and presentations,

17  including promotions, advertising projections and awards

18  recognitions.  So, one, it's not limited to the particular

19  products.  We don't know whether -- you know, for the PEM.

20  We don't know whether counsel is going to suggest that any of

21  these types of documents are relevant for other products,

22  because they're in the module.  We don't know what their

23  position is.

24      It would be helpful for each of the categories.  And,

25  again, this is information that we've asked for, because the

1  categories are so broad, it would be helpful to understand

2  what it is they're trying to -- what is the information

3  they're trying to get.  It's not just the broad category of

4  documents.

5      So in the meet and confer, we need help identifying and

6  understanding what it is that they think is relevant, and

7  what it is that's in these documents.  And then we can look

8  for documents that have that information, once we agree that

9  that information is relevant and proportional.  But what

10 they're looking for --

11     THE COURT:  Doesn't it help -- doesn't it help to

12 know that we're limiting everything to the specified

13 documents, for now?  The ones that are set forth.  Does that

14 help?

15     MR. BRUN:  So in our meet and confer, if they agree

16 to doing that -- but I'll give you an example.  There's

17 another category, Category 5, that requires licensing

18 policies and licensing, again a high-level, royalty and other

19 settlement and joint-venture documents -- I have no idea what

20 joint-venture documents could be relevant here -- including

21 any rates of payments.

22     So for all I know, counsel could be arguing that a

23 licensing agreement or a settlement agreement relating to or

24 covering one of the other products that's in our module,

25 could somehow be relevant to the products that are actually

1   accused here.  So we just don't know that.  If counsel is

2   going to say --

3              THE COURT:  Well --

4              MR. BRUN:  Go ahead, Your Honor.

5              THE COURT:  I thought the general consensus was that

6   we were limiting things to the accused products now.  That

7   anything pertaining to other products that might contain the

8   software or the modules would have to wait until later, until

9   after there's a decision on infringement.  So why wouldn't

10  that same ruling apply to all of these?  I mean, he wrote

11  these requests before we talked about it.  But I'm assuming

12  that we've all agreed that this is all going to be limited --

13  any royalty agreements or licensing agreements are only going

14  to be licensing agreements that apply to the accused

15  products, right?

16             MR. BRUN:  And that's very helpful.  And if that's

17  going to be considered now, to satisfy these requests, my

18  expectation is is that counsel was asking for a lot more than

19  that, but if that's going to be --

20             THE COURT:  He wrote that list last night before we

21  had this discussion.

22       So I assume, Mr. Stern, that we're going to set the same

23  parameters for the documents on your list, correct?

24             MR. STERN:  Yes, Your Honor.

25             THE COURT:  Okay.

1     Does that help, Mr. Brun?

2          MR. BRUN:  That certainly does help.  And I do still

3     think that you've instructed us we should meet and confer

4     over these issues, and the interrogatory that Mr. -- that

5     counsel has identified.  And so -- and then we can show up on

6     the 15th, with an identification of what has been produced,

7     and also what we've agreed to produce.  And hopefully -- and

8     that shouldn't, in our opinion, require any additional

9     directions from the court.  We should be able to get this

10    done.

11         THE COURT:  Hopefully for me, too.  I feel the same

12    way.

13         MR. BRUN:  Well, maybe I'm too optimistic.  But I'm

14    trying.

15         THE COURT:  No.  I'm going to suggest that you meet

16    and confer, and go through each one of these, with the

17    court's ruling in mind.  And if at the -- I hate to issue an

18    invitation like this, because I really do not enjoy these

19    discovery conferences, but I do think they're case shaping

20    and they have to be done.

21     So what I'm going to say is if you narrow it down and

22    there are one or two that you can't figure out, you can't

23    agree on what it means, even with the court's guidance, that

24    we should put some of these things over until after there's

25    been a determination of infringement or not.

1    You know, many of these cases just bifurcate a lot of this

2   stuff.  And in a sense, that's what I'm suggesting you do,

3   that you work with what's relevant now, and not overextend,

4   with the understanding that there may be a second round of

5   discovery.

6    But why don't you do this:  Meet and confer.  Go through

7   the document requests, the interrogatories, and if there are

8   any -- hopefully there would only be one or two that you

9   can't agree on -- you can arrange another conference with me,

10  and I'll help you.  But I think I've given you enough

11  guidance, and you both sound very savvy about this stuff.  So

12  I have a feeling you can work it out.  And I won't hear from

13  you again.

14    But I don't mind if I do.  Okay?  I'm here to help you

15  get, what sounds like a fairly complicated case -- I want it

16  to get going.  So I don't want you to let a lot of time go by

17  and still not have done your discovery.  Okay?

18    So call me back if you have a problem.  But do try and sit

19  down and at least narrow it to maybe one or two areas.  Okay?

20    MR. BRUN:  Thank you, Your Honor.  This is Shane Brun

21  for F5.  Hopefully we don't have to contact you again with

22  any disputes.  But I think we're still on the calendar for

23  the status report; is that correct?

24    THE COURT:  Yes, you are.  Yes, you are.  You are.

25  Okay, Mr. Stern?

1          MR. STERN:  Sorry, that was for the 15th?  Is that

2    what we discussed?

3          THE COURT:  Yes.

4          MR. STERN:  Okay.  Thank you, Your Honor.

5          THE COURT:  We will try to address, summarizing what

6    just happened.  But hopefully I won't hear from you again.

7    But meet -- well, wait a minute.  Do you want to set a date

8    for the meet and confer, or are you going to do that

9    yourselves?

10          MR. BRUN:  While we're on the phone, so we can get it

11    done sooner rather than later, counsel, I can make time

12    available on Monday.  If we can find time on Monday, counsel

13    for WSOU and I will meet on Monday.

14          THE COURT:  How about that?

15          MR. STERN:  Yes.

16          THE COURT:  Do you want me to set a time, or just say

17    plan to meet on Monday at a time mutually acceptable?  Okay?

18          MR. STERN:  Yes, Your Honor.  That's acceptable.

19          MR. BRUN:  Yes, that works for F5.

20          THE COURT:  Okay.  Counsel?

21          MR. BRUN:  Sorry, Your Honor.  Will we be receiving

22    an e-mail from the court setting a time for the October 15th

23    status call?

24          THE COURT:  I don't think the -- as I understand it,

25    you were just going to do a status report.  You didn't need a

1  call.

2           MR. BRUN:  Okay.  That would be fine.  Thank you.

3           THE COURT:  I think that's something that counsel do

4  together and submit to the court, an agreed status for the

5  rest of the case.  Okay?

6           MR. BRUN:  Perfect.  Thank you very much.

7           THE COURT:  You don't need me for that.  Okay?  Okay.

8  We'll get you an e-mail about this one though.  Okay?

9           MR. BRUN:  Your Honor, if I may, sorry to hold Your

10 Honor on the line, there's one more issue relating to the

11 protective order in the case.

12    There are about three sub-issues with respect to the

13 protective order that the parties raised in its initial

14 e-mail to the court that need to be resolved.  Particularly,

15 given, if there's going to be a source code production.

16           THE COURT:  Sure.  Sure.  What are those issues?

17           MR. BRUN:  So, one issue is the printing of pages and

18 how many pages, both consecutively and in total, to be

19 printed, of the source code in each of the cases.  The second

20 issue is the scope of a prosecution bar for plaintiff's

21 counsel.  And the third issue is an acquisition bar, whether

22 it's necessary, and if so, the scope.  We're ready to address

23 those issues for the court this morning -- or, sorry -- this

24 afternoon, if that's convenient for Your Honor.

25           THE COURT:  Sure.  Why don't we try to take care

1   them?  What is the thing about the number of pages?  Why

2   don't you go ahead.

3          MR. STERN:  Sure, Your Honor.  WSOU is seeking that

4   it be allowed to print 25 continuous pages, per accused

5   product, per patent, and 300 pages in total, per accused

6   product, per patent.  We believe that we, given defendant F5

7   counsel's representation that the functionality is really in

8   the source code, we're concerned that if we limit it any

9   further, we may have issues in this case.  And we would

10  prefer not to come back to the court with any additional

11  issues on page printing.

12      We believe that it's reasonable, and other courts have

13  held this way, that 300 pages, about 300 pages, sometimes

14  even 400, is reasonable.  We believe there's at least one

15  case with F5 as a defendant that has 400 pages, where the

16  court has either ordered, or it was agreed.  So we believe

17  that's a reasonable approach right now.

18          THE COURT:  Mr. Brun?

19          MR. BRUN:  Yes, Your Honor, for F5.

20      What counsel is asking for here is 300 pages per case, so

21  that's per patent.  There are five patents.  1,500 pages of

22  source code.  I'm not sure -- possibly the case that

23  Mr. Stern or counsel is talking about, I have a case with

24  Judge Alsup in San Francisco.  We have a case -- in that

25  case, there are four patents involved in the case, so just

1   one less than here, and there's a total of 300 pages of

2   source code allowed, and ten consecutive pages.

3       But that also has a provision in it, as most protective

4   orders do, that if the plaintiff feels that it needs more,

5   the parties are ordered to meet and confer in good faith, and

6   either provide more -- whether it's more total documents or

7   more consecutive.

8       So, for example, if there's a particular software

9   functionality, or code functionality that's rolling over more

10  than ten pages, we would absolutely agree to produce that.

11  But these protections, again, what they're asking for is

12  1,500 pages of source code, of F5's source code.  That's a

13  lot of pages of the crown jewels and most sensitive

14  information that F5 has.  And that is a very large number of

15  documents.

16      But, again, there should be a provision in there that if

17  counsel, WSOU, come back to us and say they need more, we

18  will work with them on that in good faith.  I don't see any

19  problems with that.

20          THE COURT:  Hold on a minute.  My deputy is telling

21  me our court reporter needs a break.  Grant?

22          THE CLERK:  No, Your Honor.  We actually have --

23  myself and the court reporter do have another hearing with

24  Judge Pechman starting at 10 o'clock.

25          THE COURT:  Well, we're going to wrap this up in a

 1  few minutes.

 2          THE CLERK:  Okay, perfect.

 3          THE COURT:  So, I didn't quite get what you were

 4  saying, Mr. Brun.  You're objecting to the number of pages?

 5          MR. BRUN:  Both the number and the consecutive

 6  printouts.  Again, so I think in the case that I was

 7  referring to --

 8          THE COURT:  Well, what were you going to give them on

 9  the 15th?  You were going to provide source code.  What were

10  you planning to give them?

11          MR. BRUN:  Oh, no.  So the full -- we're going to

12  give them the full source code.  What these pages refer to is

13  how many pages that -- while their expert is reviewing the

14  source code -- how many actual hardcopy pages that the source

15  code they can print out.

16      So the source code itself is on a computer in a conference

17  room that has no external access.  This has to do with how

18  many pages they can print out, and how many consecutive pages

19  they can print out that will cover -- that actually shows how

20  a particular functionality is implemented.

21          THE COURT:  You know what, guys, I can't believe you

22  can't work this out.

23          MR. BRUN:  I can't either.

24          THE COURT:  Mr. Stern, really, you don't need me.

25  What do you want me to tell you, ten pages, 15 pages?  I want

1  you to try to work it out.  Okay?

2      MR. STERN:  Understood, Your Honor.

3      THE COURT:  All right.  Do we have time, Grant,

4  before you guys have to disappear, to do the other two

5  problems?

6      You said there were two more problems under the protective

7  order.

8      MR. BRUN:  Yeah, so if I may, Your Honor, this is

9  Shane Brun with King & Spalding.  Can I address those first?

10     THE COURT:  Yes.

11     MR. BRUN:  So, the first one is an acquisition bar.

12  And so what that means is -- and actually let me ask, a

13  threshold question there is, should someone on counsel's

14  team, a WSOU attorney, who has access to and reads F5's

15  source code, should they be able to use that source code to

16  acquire patents that then could be used to sue F5?  So I

17  believe that any reasonable person would agree that the

18  answer to that is, no.  And that's all we're asking for.

19  It's a routine aspect.

20     THE COURT:  Okay.  Mr. Stern, you're not really

21  asking for permission to do that, are you?

22     MR. STERN:  No.  We're not asking for permission to

23  do that, Your Honor.

24     I think the issue really comes down to, there are numerous

25  provisions, or at least one main provision in the protective

 1    order that has limited use.  Now, attorneys and their

 2    consultants have always been bound by the limited use, and

 3    that any confidential information that we receive or see

 4    cannot be used for any other purpose.

 5         So we, as usually is the case, are agreeing to be bound by

 6    that, that we're not going to use F5's -- quite frankly, I'm

 7    a little taken back -- but we agree, we're not using F5's

 8    source code or highly confidential information in any way

 9    outside of this matter.

10         But what F5 is seeking is something far more expansive

11    than other protective orders we've seen.  We don't usually

12    see protective orders with acquisition bars.  And even if we

13    do, it's usually limited to the party itself.  In other

14    words, we could potentially agree, if Your Honor so wishes,

15    to include an acquisition bar, where counsel at Kasowitz who

16    reviews the source code, could not advise WSOU on

17    acquisitions.

18         But going beyond that, I think, is unnecessary and

19    unproductive.

20              THE COURT:  Wait a minute, you just agreed that WSOU

21    wasn't going to be using the source code for anything.

22              MR. STERN:  Definitely not.  Definitely not, Your

23    Honor.  Definitely not.

24              THE COURT:  Well, what's the problem with putting

25    some version of that into the protective order?

1    MR. STERN:  Understood.

2      So what defendant F5 is seeking is to bar the Kasowitz

3    firm, or its consultants, from assisting anyone else besides

4    WSOU in relation to any acquisition.  That is more so the

5    issue and the scope --

6        THE COURT:  Ever?  Any acquisition in the world?  Or

7    any acquisition that just relates to this software?

8        MR. STERN:  That relates to this software.  But also

9    the time period.  Defendant F5 is seeking a three-year bar as

10   well.  So we're okay with Your Honor having an acquisition

11   bar in place that's limited to counsel for WSOU, should

12   anyone see highly confidential information, from advising

13   WSOU.  That could be acceptable.  But I think going outside

14   that is far expansive, and I haven't seen that.

15       THE COURT:  I don't understand.  It's not just

16   counsel, they're talking about consultants, experts, right?

17       MR. STERN:  Agreed.  Agreed.  For all that class of

18   individuals.  To the extent an expert here, or consultant, or

19   anyone at WSOU sees any highly confidential information

20   that's technical, agreed, they can use that for acquisitions

21   in the area of the scope of the patent.  But not outside

22   WSOU.

23       THE COURT:  So you're agreeing, then?

24       MR. STERN:  Yes.  I think the distinction is whether

25   consultants can consult with other companies relating to

1    that.

2         THE COURT:  At all?  Relating to these patents, or

3    any patent?

4         MR. STERN:  It's any patent, within the scope or

5    related field, is what defendant F5 is looking for.  That's

6    more of the issue, Your Honor.

7         THE COURT:  Well, Mr. Brun, you're not trying to keep

8    them from going into any patents, are you?  You're just

9    trying to go to the ones that are involved in this lawsuit,

10   right?

11        MR. BRUN:  Right.  The way these provisions are

12   written, it's related to the patents in lawsuit or related in

13   the field, and the field is defined.  And so, again, what's

14   -- and what counsel is agreeing to here -- so, WSOU, their

15   business is to acquire patents and file lawsuits.  That's

16   their revenue model.  There are other companies like that.

17   And if there's an expert in this case that has F5's source

18   code, and has that information, he or she can't just unlearn

19   that information.  And if they're working with another

20   non-practicing entity, not WSOU, again, they should be barred

21   for a certain period of time from consulting with respect to

22   the acquisition of patents in the field in which F5's modules

23   operate.

24        THE COURT:  Okay.  Mr. Stern, that sounds reasonable

25   to the court.  That sounds reasonable to the court.  So, I

1   think that resolves your problems with the protective order.

2   Right?

3          MR. BRUN:  There's the prosecution bar, Your Honor.

4          THE COURT:  What's that?

5          MR. BRUN:  Once again, it's in almost every

6   protective order in a patent case.  So what happens in patent

7   cases often, is that the defendant will file --

8          THE COURT:  Who is speaking?

9          MR. BRUN:  I'm sorry.  I meant to do that again.

10  Shane Brun is speaking.

11         THE COURT:  Okay.  Go ahead.

12         MR. BRUN:  So, in a lot of patent cases the defendant

13  will file a request with the patent office to review the

14  patents for validity.  It's called, these days it's --

15         THE COURT:  Yeah.  Right.

16         MR. BRUN:  And there is generally, because, again,

17  it's for attorneys and consultants, experts, who have access

18  to the source code, so that they know the specific operation

19  of F5's products and the modules, that they can't -- those

20  attorneys with that information, similar to the acquisition

21  bar, can't participate in that sort of inter partes review in

22  the patent office, where the scope of the claims, whether it

23  be through an interpretation, or an argument, or an actual

24  amendment of the claims, is made.  It gives an advantage to

25  that party over F5, just because of their access to the

1  source code that they shouldn't have.  It's unfair to F5.

2  And, again, it's a standard provision in almost every

3  protective order.

4         THE COURT:  Mr. Stern, what's the problem with that?

5         MR. STERN:  Your Honor, Mr. Brun repeatedly states

6  that this is standard.  It's not.  We've entered into

7  numerous protection or prosecution bars where we're okay with

8  entering into such a bar, with a carveout to participate in

9  proceedings at the USPCO that do not concern amendments of

10  claims scope in it.  So there is no issue in that way.  We

11  don't participate in the actual amendment in any way, whether

12  it's conflicting or not.

13     In those invalidity proceedings, we want to be able to

14  defend the claim that those patents are alleged to be

15  invalid.  That's all.  It has nothing to do with amending the

16  claim scope.

17     To the extent counsel for F5 has made the argument that

18  allowing us to participate in such proceedings, because we

19  can make arguments to narrow the scope, those types of issues

20  come up all the time in claim construction.  In fact, we're

21  going to have claim construction hearings in a couple months.

22  That could occur, you know, at that point.  I highly doubt

23  it, but making arguments about --

24         THE COURT:  Hold on.  Well, for the time being let's

25  leave it in.  And we'll worry about it -- you can raise this

1     again.  If the issue really comes up and you're still arguing

2     about it, you can raise it later on.  But for now, leave it

3     in.  Okay?

4              MR. STERN:  Understood.  Thank you, Your Honor.

5              MR. BRUN:  All right.  Thank you, Your Honor.

6              THE COURT:  We'll try to get you a minute entry.  But

7     I think it's time to let our court reporter go for Judge

8     Pechman's hearing.  Okay?

9              MR. STERN:  Perfect.  Thank you.  Thank you for

10    staying on so long.  It's very helpful.

11             THE COURT:  Thank you, counsel.  Good-bye.

12                        (Adjourned)

13

14                   C E R T I F I C A T E

15

16

17       I certify that the foregoing is a correct transcript from

18    the record of proceedings in the above-entitled matter.

19

20

21

22    */s/ Debbie Zurn*

23    DEBBIE ZURN
      COURT REPORTER

24

25