The Honorable Barbara J. Rothstein

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WSOU INVESTMENTS, LLC,

      Plaintiff,

    v.

F5 NETWORKS, INC.,

      Defendant.

Civil Action Nos. 2:20-cv-01878-BJR
No. 2:21-cv-00124-BJR
No. 2:21-cv-00125-BJR
No. 2:21-cv-00126-BJR

ORDER GRANTNG DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

## I.      INTRODUCTION

      This case involves four separate patents that Plaintiff claims Defendant is infringing.
Defendant has filed a motion for summary judgment in each of the four cases.  In three cases,
Plaintiff has responded with a "contingent non-opposition" that essentially concedes summary
judgment in those cases.  The only summary judgment motion that Plaintiff substantively
opposes is the one filed in Case No. 21-cv-126.  Having reviewed that motion, the record of the
case, and Plaintiff's opposition, the Court will grant Defendant's motion for summary judgment.
The reasoning for the Court's decision follows.

1

## II.      BACKGROUND

In December 2021, the Court held a *Markman* hearing on 14 disputed terms across the four patents.  Dkts. 78-79.[1]   On January 28, 2022, the Court issued a claim construction order that defined the disputed terms.  Claim Construction Order, Dkt. 89.  In so doing, the Court established what Plaintiff needed to prove in order to succeed on their infringement claims.  The parties then engaged in lengthy discovery.  On June 10, 2022, Defendant filed motions for summary judgment in all four cases.  On July 1, 2022, Plaintiff filed statements of contingent non-opposition in three of the four cases and claimed the parties were negotiating stipulations to dismiss those cases.[2] (Case No. 20-cv-1878, Dkt. 238; Case No. 21-cv-124, Dkt. 153; Case No. 21-cv-125, Def. Mtn. for SJ, Dkt. 154).  In Case No. 21-cv-126, Plaintiff filed an opposition to Defendant's summary judgment motion.  Pl. Opp'n to SJ, Dkt. 173.  Defendant's motion seeks summary judgment on the issues of noninfringement, anticipation, invalidity, and a failure to establish elements of direct and indirect infringement.  *See* Def. Mtn. for SJ, Dkt. 154.  As discussed below, the Court finds the issue of noninfringement to be dispositive, and thus will not discuss the other issues raised in Defendant's motion.

## III.     LEGAL STANDARD

Summary judgment in a patent case is like summary judgment in any other case.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

---

[1] Unless otherwise noted, docket numbers cited herein refer to the docket of Case No. 21-cv-126.

[2] In Case No. 20-cv-1878, Plaintiff continued to pursue a motion for partial summary judgment it had filed on June 10, 2022, even after they had filed the non-opposition statement indicating the case would be dismissed.  Case No. 20-cv-1878, Dkt. 210.

Summary judgment may be granted on several grounds, including noninfringement.

Determining whether summary judgment is appropriate on the issue of noninfringement "entails a two-step analysis—construction of the claims, a matter of law; followed by application of the claims to the accused device, a question of fact." *Voice Techs Grp. v. VMC Systems Inc.*, 164 F.3d 605, 612 (Fed. Cir. 1999) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)).   Although noninfringement is a question of fact, the Court may grant summary judgment "when it is shown that the infringement issue can be reasonably decided only in favor of the movant, when all reasonable factual inferences are drawn in favor of the non-movant." *Id.*  Summary judgment is particularly appropriate when "the parties d[o] not dispute the structure of the accused devices," and the only question before the Court is the meaning of a claim constructed during the *Markman* hearing.  *Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1461 (Fed. Cir. 1998).

## IV.   DISCUSSION

### A. Background

In its January 2022 order on claim construction, the Court provided a general description of each of the patents before analyzing the individual claims.  For consistency, the Court will repeat its description of the patent in Case No. 21-cv-126 (the "945 patent") in full here:

> Patent '945 is described as "[a] [s]ystem, apparatus, and method using a master device in a cluster of devices to select a network device to respond to a DNS query." Dkt. No. 134 at 3 (citing Dkt. No. 100-9 at ECF 2).  Every device connected to the internet has a unique IP address—a complicated numerical sequence—that identifies it to other devices.  Devices include personal cell phones and computers, as well as email and web servers that personal devices must contact in order to interact with their email or a website.
>
> A domain name service ("DNS") allows users to connect (i.e., query) to a particular site on the internet by simply typing in the domain name (e.g., CNN.com) rather than the specific numerical IP address of the server the user's device needs to

3

contact.

> Large networks, such as popular websites, require more than one server to handle the volume of queries they receive. When there is a "cluster" of multiple servers, there must be a system for efficiently assigning queries to the server that is best equipped to handle them at the time the queries are received—a process known as "load balancing"—so that no one server becomes overloaded. An Authoritative Name Server ("ANS") is a device that performs this function. When it receives DNS queries, it assigns them to the other servers. The patented technology before the Court was designed as a modification and improvement of the existing system. Instead of designating a single, separate device to permanently serve as the ANS, the patented technology allows any device in the cluster to serve as a "master device" as needed. Additionally, the patented technology claims to enhance the communication between the master and other devices, with the latter sending status information to the master device in real time. The master device can then make more informed decisions in executing its load-balancing function.

Claim Construction Order, Dkt. 89 at 14-15.

Following this description, the Court defined the disputed terms in the 945 patent: "master device," "an authoritative domain name server," and "a predefined load balancing algorithm." *Id.* at 15-17. Most relevant here is the term "master device." The patent claim in which that term is used states: "[a] system comprising: a plurality of network devices grouped in a cluster, wherein each network device has a different respective device internet protocol (IP) address; wherein one of the network devices is designated as **a master device**." Case No. 20-cv-1878, Dkt. 100-9 at ECF 9-10 (Claims 1A, 6B, 12A) (emphasis added). Defendant lobbied for this term to be construed as "a single network device controlling the other devices in the same cluster," but the Court adopted Plaintiff's definition: "a device in a cluster that is configured to select other device(s) at a given time." *See* Claim Construction Order, Dkt. 89 at 15.

Among other things, the Court favored Plaintiff's use of "a device" rather than "a single network device," because the patent is clear that "any device in the cluster can serve as the master device, and the device playing the master role may change as needed." Claim Construction Order,

4

Dkt. 89 at 15.  The Court emphasized that "[t]his flexibility and interchangeability is among the patented technology's intended improvements upon the prior art, in which only one device, separate from the others in the cluster, served as the ANS."  *Id.* (citing Case No. 20-cv-1878, Dkt. No. 134 at 19).  Defendant's use of the term "a single network device" "seem[ed] more aptly to describe the prior art than the patented technology."  *Id.*

**B. Dispute Over Meaning of Patent Claims**

The parties' primary dispute on summary judgment concerns whether the 945 patent necessarily requires that *any* device in a cluster of devices can serve as the master device at any given time, and thus that a product can only infringe the patent if it possesses this capability.[3]  *See* Def. Mtn. for SJ, Dkt. 154 at 7; Pl. Opp'n to SJ, Dkt. 173 at 10-11.  Defendant argues that interchangeability is a necessary component, whereas Plaintiff describes it as "permissible" but not required.  Def. Mtn. for SJ, Dkt. 154 at 7; Pl. Opp'n to SJ, Dkt. 173 at 10-11.  Both parties contend that the Court's construction of "a master device" supports their position.  Defendant argues that the Court identified the interchangeability of devices in a cluster as a key difference between the patent and prior art.  Def. Mtn. for SJ, Dkt. 154 at 9 (citing Claim Construction Order, Dkt. 89 at 15 ("This flexibility and interchangeability is among the patented technology's intended improvements upon the prior art.")).  Plaintiff argues that "the *Markman* Order is clear that interchangeability is not required in the construction itself, even if the Court stated that it is permitted."  Pl. Opp'n to SJ, Dkt. 173 at 9 (citing Claim Construction Order, Dkt. 89 at 15 ("[T]he device playing the master role *may* change as needed" (emphasis in Plaintiff's brief))).

---

[3] For simplicity, the Court often refers to this capability as "interchangeability."

Plaintiff's interpretation of the Court's construction defies the plain language of the order. As Defendant notes, the "flexibility and interchangeability" of the patented technology—which specifically referred to the ability of the master device to change as needed—was a key part of the Court's definition of "master device." Plaintiff implies that, in rejecting Defendant's proposed construction, which would have "narrow[ed] the scope of the 'master device' to only a *single* device being capable of being the master that *controls* the other devices," the Court signaled that the interchangeability of cluster devices was not necessary. Pl. Opp'n to SJ, Dkt. 173 at 9 (emphasis in original). Precisely the opposite is true. The interchangeability of cluster devices was the very reason the Court rejected Defendant's proposed construction. *See* Claim Construction Order, Dkt. 89 at 15. In the first sentence of its claim analysis, the Court stated that "[w]hile Defendant is correct that the patented technology contemplates there being only one master device in a cluster at a given time, any device in the cluster can serve as the master device, and the device playing the master role may change as needed." *Id.*

Plaintiff seizes on the word "may" in the phrase "the device playing the master role *may* change as needed" as supporting its argument that interchangeability in permitted but not required. *Id.* (quoting Claim Construction Order, Dkt. 89 at 15 (emphasis in Plaintiff's brief)). Plaintiff also points to a similar phrase in the patent claim itself, which reads: "[t]he designation of master device *may* be transferred as necessary from one device to another device." *Id.* at 9-10 (emphasis added) (quoting Naggar Decl., Dkt. 172-1 at 7:37-38). Plaintiff takes the word "may" out of context. The master device only changes "as needed." On a given day, it may not change if conditions do not require it, and on another day it may change several times. Thus, the "may" refers to options users have that the prior art did not give them—it does not suggest that the existence of this capability itself is optional in the design of the technology.

6

Not only is this explicit in the Court's order, but it is also evident from the materials presented by Plaintiff at the *Markman* hearing, on which the Court relied in its claim construction. For example, Plaintiff used this figure to represent the prior art:



To represent the patented technology, Plaintiff used the following:



Pl. Markman Presentation, Case No. 20-cv-1878, Dkt. 134 at 19, 24.  Plaintiff's depiction of the two systems demonstrates that, in the prior art, only one device of a specific type could serve as the ANS, but in the patented system, any one of the devices in the cluster—all of the same type—could perform that function at a given time.  This is corroborated by Plaintiff's counsel's narration

of these slides during the hearing:[4]

> [T]he master device can be up here, or it could be any one of these down here. In other words, the invention of the patent -- Your Honor asked earlier, like, well, what was the big deal of this patent, there must have been some advantage of this patent. Well, one of the advantages of this patent was that the master device, at any given time, could be any one of these four devices. In other words, if the top server were to default -- right? -- and go down because someone unplugged it by accident, it wouldn't [cause] CNN's entire servers or web pages [to] go down. You wouldn't have CNN not have a master or a domain name server there, right? They would just flip to another server. Another server would be able to act as the master at any given time. . . . That's automatic by this patent. That's the benefit.

Markman Hearing Transcript, Case No. 20-cv-1878, Dkt. 136 at 109:17-110:7.  Plaintiff's counsel explicitly stated that "any one of the[] four devices" could "automatically" become the master at "any given time" and highlighted this interchangeability as a key feature that makes the patented technology unique.  *Id.*  The example counsel provided also illustrates how interchangeability is essential to the patent.  The problem of the master server in a cluster going down (and potentially taking a website offline) can only be averted if the remaining servers in the cluster have the same capability to serve as master when called upon.

The position Plaintiff now takes in its opposition to summary judgment—that interchangeability is not necessary—directly contradicts this characterization.  Plaintiff essentially argues that a product can infringe its patent even if the product does not contain one of the patent's biggest improvements upon the prior art.  This is contrary to all of Plaintiff's prior representations and the Court's claim construction order.  Accordingly, the Court finds that Defendant's product

---

[4] It is impossible to know exactly which slide counsel was referring to when making this statement, but the Court has determined that it is either one of the slides included in this order or a slide containing substantially the same figures, because only those slides contain an image of "four devices" that is consistent with counsel's description. *See* Pl. Markman Presentation, Case No. 20-cv-1878, Dkt. 134 at 15-24.

cannot infringe the patent unless it features a system in which any device in a cluster can function as the master device at any given time.

## C. Absence of Factual Dispute as to Noninfringement

Having clarified the definition of the relevant patent claims, the only remaining question is whether there is a genuine factual dispute as to whether Defendant's product fits the definition and thus infringes the patent. To survive summary judgment, Plaintiff must show that there is a genuine dispute as to whether Defendant's product BIG-IP DNS features a system in which any device in a cluster can function as the master device at any given time.

Although Plaintiff dedicates the vast majority of its noninfringement argument to disputing that interchangeability is necessary, Plaintiff's opposition contains four sentences purportedly demonstrating that BIG-IP DNS nevertheless possesses the required interchangeability:

> [E]ach BIG-IP appliance includes all of F5 modules; the user merely activates the license for the software. Ex. 20 (Shriver Dep. Tr.) at 94:9-97:5 (describing that a user can activate BIG-IP software modules by purchasing license). In F5's primary configuration where BIG-IP DNS load balances to appliances running BIG-IP LTM, any of those F5 BIG-IP appliances could become the master DNS. See, e.g., Ex. 3 (Cole I) ¶¶ 84, 109, 118, 133-135, 146, 155-156, 167, 203-204, 265-266, 292-294. Similarly, in a BIG-IP DNS sync group, each of those can be the master device. Ex. 3 (Cole I) ¶ 121; Ex. 25 at 47. Furthermore, F5 allows its customer to define objects in the cluster. Ex. 3 (Cole I) ¶139; Ex. 25 (F5_0000115617) at 13-17.

Pl. Opp'n to SJ, Dkt. 173 at 13. The Court will analyze each of the statements made in this paragraph and their citations to the record to determine whether they raise a genuine dispute of fact.

### 1. "[E]ach BIG-IP appliance includes all of F5 modules; the user merely activates the license for the software. Ex. 20 (Shriver Dep. Tr.) at 94:9-97:5."

This statement, even if true, is not relevant to the issue of interchangeability. That a user

activates a license for a particular software does not necessarily mean that BIG-IP DNS features server clusters in which any server can serve as the master.  That each BIG-IP appliance includes "all F5 modules" is meaningless unless one of those modules infringes the patent, and this statement does not allege that.

> **2. "In F5's primary configuration where BIG-IP DNS load balances to appliances running BIG-IP LTM, any of those F5 BIG-IP appliances could become the master DNS. See, e.g., Ex. 3 (Cole I) ¶¶ 84, 109, 118, 133-135, 146, 155-156, 167, 203-204, 265-266, 292-294."**

This statement alleges the required interchangeability but is at odds with the record. Plaintiff's citations (all from their expert Dr. Eric B. Cole's declaration) are numerous but unsupportive.  Because many of the cited statements by Dr. Cole are very similar, the Court will group them into categories and analyze a representative sample of each.

The first category of citations (Naggar Decl., Dkt. 173-1 ¶¶ 84, 109, 118) are taken out of context and unrelated to the issue of interchangeability.  For example, Dr. Cole stated that "F5's primary software modules can also work together and be deployed together with F5's BIG-IP LTM system, platform, and/or products (including cloud and virtual versions), F5 servers (including application and web servers) . . . among other F5 products that interface or work in conjunction with such products." *Id.* at PDF 35 ¶ 84.  This statement and the surrounding paragraphs merely note that various F5 products and systems are compatible with each other and that several different combinations of software and platforms can be used together. *See id.* at PDF 33-37 ¶¶ 81-85.  The other statement cited by Plaintiff similarly notes that BIG-IP DNS can also be paired with third-party devices. *Id.* at PDF 45-46 ¶ 109.  The record citations in this category thus concern an entirely different topic and do not contain any relevant factual allegations.

The second category of citations (Naggar Decl., Dkt. 173-1 ¶¶ 133-35, 146, 155-56)

describes BIG-IP DNS's ability to function as a master device in a cluster of other devices.  In the examples provided by Dr. Cole, the other devices in the cluster are BIG-IP LTMs, a different F5 product.  Dr. Cole describes a "pool implementation" of BIG-IP as one in which "[BIG-IP] DNS can use cache functionality to act as the authoritative name server while also load balancing. . . . [i]n this way, BIG-IP DNS is designated, among a plurality of network devices grouped in a cluster, as a master device."  *Id.* at PDF 57 ¶ 135.  Similarly, Dr. Cole describes the "Wide-IP Configuration" of BIG-IP as one in which "various pools in are grouped in cluster with the BIG-IP DNS being the master. . . . [and] BIG-IP DNS load balances to the BIG-IP LTMs in the cluster." *Id.* at PDF 79 ¶ 146.  These statements speak to BIG-IP DNS's ability to function as the master device in a cluster, but Dr. Cole does not opine that BIG-IP DNS is interchangeable with LTM devices.  More specifically, Dr. Cole does not suggest that BIG-IP DNS can perform the same functions performed by LTMs or that LTMs can automatically become the master device and perform the load-balancing function in the event BIG-IP DNS goes offline.  BIG-IP DNS and BIG-IP LTM are discussed as two different products, and it is Plaintiff's burden to show that, when operating together in a cluster, these products can automatically switch roles.  However, nothing in this category of record citations alleges that.

The third category of citations (Naggar Decl., Dkt. 173-1 ¶¶ 167, 203-04, 265-66, 292-94) are statements by Dr. Cole focused on BIG-IP DNS's ability to "respond[] to DNS queries without querying other servers" and "select[] a device based on the status information communicated by the network device"—i.e., perform the functions of an ANS.  *See, e.g. id.* at PDF at 95, 124 ¶¶ 167, 203-04.  These statements have no bearing on the issue of interchangeability.  Dr. Cole states only that BIG-IP DNS can perform ANS functions.  He does not opine that the other devices in the cluster (e.g., BIG-IP LTMs) are also capable of responding to DNS queries and selecting other

devices if called upon—for example, if BIG-IP DNS were accidentally disconnected.  Nor does he allege that BIG-IP DNS can switch roles and perform the functions of BIG-IP LTM—communicating its own status information to another device designated as the ANS.

In summary, Plaintiff's assertion that, "[i]n F5's primary configuration where BIG-IP DNS load balances to appliances running BIG-IP LTM, any of those F5 BIG-IP appliances could become the master DNS" is unsupported by its citations to the record and does not create a genuine dispute of fact.

**3.  "[I]n a BIG-IP DNS sync group, each of those can be the master device.  Ex. 3 (Cole I) ¶ 121; Ex. 25 at 47."**

In support of this statement, Plaintiff cites Dr. Cole's assertion that "F5's brochures describe an additional configuration in which there may be a group of DNS devices configured together as a cluster."  Pl. Opp'n to SJ, Dkt. 173 at 13 (citing Naggar Decl., Dkt. 173-1 at PDF 46-47 ¶ 121; Naggar Decl., Dkt. 173-13 at 47).  This statement merely suggests that BIG-IP DNS can operate in a cluster.   It does not even contain the term "master device," let alone allege that the master device can change as needed.

**4.  "F5 allows its customer to define objects in the cluster.  Ex. 3 (Cole I) ¶139; Ex. 25 (F5_0000115617) at 13-17."**

This statement offers no support to Plaintiff's claim that BIG-IP DNS is interchangeable with other devices in a cluster.  The relevant issue is not which devices can be used to form a cluster, but rather what capabilities those devices have.  Furthermore, Plaintiff's citation to Dr. Cole's opinion that "BIG-IP DNS . . . serves as the master DNS and is authoritative because it resolves DNS queries directly" is repetitive of similar statements the Court has already found to be irrelevant to the issue of interchangeability.  *See* Pl. Opp'n to SJ, Dkt. 173 at 13 (citing Naggar Decl., Dkt. 173-1 ¶ 139; Naggar Decl., Dkt. 173-13 at 13-17).

Having reviewed each of Plaintiff's allegations and the evidence supporting them, the Court finds that Plaintiff has not established a genuine dispute as to any material fact.  Neither Plaintiff's opposition brief nor their expert's analysis allege that BIG-IP DNS can function interchangeably with other devices in a cluster—a fact necessary to establish infringement.  Accordingly, drawing all factual inferences in Plaintiff's favor, Plaintiff cannot succeed on their infringement claim, and summary judgment is appropriate.  Because this holding is dispositive of the case, the Court need not reach the issues of anticipation and invalidity.

## V.  CONCLUSION

For the foregoing reasons, the Court hereby GRANTS Defendant's motion for summary judgment (Dkt. 154).  The Court hereby strikes all other outstanding motions in this case (Dkts. 142, 148, 151, 197, 200).

DATED this 13th day of December, 2022.

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE